Good morning. May it please the Court. Alexander Teofsky for Flemming Kristensen and the class. If it's possible, I'd like to reserve three minutes for rebuttal. The issue in this case is whether payday lenders and their marketing consultants can be held liable for a text message spamming campaign. Could I ask you a threshold question, which was just puzzling me, which is that, with respect to ClickMedia, your client stipulated the entry of summary judgment, so basically agreed that there was no genuine issue of material fact with respect to ClickMedia. So how is it that – what is the status of ClickMedia now? I don't – I'm not seeing any basis or authority that would say you could pursue an appeal of the stipulated agreed-to dismissal of – or on summary judgment of ClickMedia. I guess I want to be clear about what happened there. So we did not stipulate to dismissal of the claim. What we stipulated was that we had – so we had moved for – we had litigated summary judgment and lost. We had moved for reconsideration and lost. And that was for the other, but the district court never ruled on ClickMedia, right, which is slightly differently situated. Well, ClickMedia hadn't moved. But the conclusion that we came to looking at the opinion and looking at the way that we moved for reconsideration was that under the way that the district court had viewed the evidence, the same conclusion would have happened with regard to ClickMedia. And look, my understanding is that ClickMedia is effectively broke. They really – So are they out of the case now? I mean, you – in fact, there was a ruling on the lenders and lead pile, but the district court never had an opportunity to rule on ClickMedia. You just agreed to a grant of summary judgment in favor of ClickMedia. What we agreed to was that – was that under the judge's previous opinion, we would lose as to ClickMedia. So do you agree that the judge's previous rulings would have compelled a judgment for ClickMedia?  That's what we agreed on. And – but you didn't waive your right to appeal that. Right. So my question is this. ClickMedia seems to me differently situated – maybe irrelevant because they're broke – maybe differently situated than some of the other defendants because it dealt directly with AC referral. But to the extent that you agree that the judge's ruling covers ClickMedia, haven't you waived that kind of argument, that somehow ClickMedia had an agency relationship or – with AC referral? Since you – you didn't – you didn't make that argument below as a separate reason for liability against ClickMedia. We made the argument below that – that – so ClickMedia did not send the text messages. No, I understand. But it had a – ClickMedia is the only party with a direct relationship with AC referral, correct? Right. So we had – we had argued this actual authority agency theory.  The only argument we had on appeal was that it was a direct relationship. Your only argument – so – Gratification. So the same – there's no different argument, to put it, that you're making on appeal that applies to ClickMedia than applies to all the other defendants. No. It's – I mean, they – you know, they have slightly different interactions, but legally it's the same argument. Making the same – so you're not arguing that they had a different relationship with AC referral than all the other defendants? No. No, we're not – we're not arguing that argument.  So let me ask you this, then, because the – the alternative or one of the arguments that's being raised here on appeal relaying to restatement of agency 403. So the FCC tells us to rely on the restatement of agency, and so does our case law says defer to the FCC on that. So – and the only issue before us seems to be on ratification. And so their argument is that, well, under 401 of the restatement, ratification doesn't occur unless the act is ratifiable, as stated in 403. And 403 says that when an actor is not an agent and does not purport to be one, the agency law doctrine for ratification is not a basis on which another person may be subject to the legal consequences. And then they argue that it's undisputed that the lenders and lead pile did not know about AC referral and AC referral didn't know about them. So why isn't that just squarely within that portion of the restatement? There's discussion in the comments in that section of the restatement, in fact, with regard to unknown agents and principals. You don't have to know specifically who the person is. Well, this says the act isn't ratifiable. I'm just reading straight out of 401 says what ratification is, and it says it has to be ratifiable. And that comment says unless somebody at least purports to be an agent, then it's not a ratifiable act. Why aren't we done? They did, in fact. So AC referral did, in fact, purport to be an agent, and here's how. And they purported to be an agent of the lenders and lead pile? They did. Because they said they didn't even know who they were or they had never heard of them. They didn't have to. So this is at record 33 to 35. So you can be purport to be an agent. Of a principal that you have not heard of and have no knowledge of. Well, to be clear, well, yes. Yes, that's your position. So, sorry, I think it's a little bit flipped here. It is that the question is whether the agent purported to be acting as an agent. They could still be unauthorized. So it's not the question of what the principal doesn't have to have done anything under that standard. Well, in this case, though, the text message they received didn't say anything about any of these lenders or the sellers or the marketers. Well, it didn't have to. But how were they purporting to act as an agent of the lenders if at most what they did was send people to Click Media's website? So the way that it was designed, and I said this is record 33 to 35, when you click on that link in the text message, it takes you to Click Media's website. It doesn't say Click Media on there anywhere. It says Smart Credit Solution. You fill out that form, and it automatically redirects you through lead pile to one of the lenders' websites. I understand what the record shows about that. My question is you say that AC was purporting to act as the agent of the lenders. And I'm saying what evidence is there that they purported to act? The only evidence is that their ads directed them to a website run by Click Media, which also didn't mention the lenders, correct? So it didn't say it on there. What it did was send you directly to the lenders. So the idea is they want it to be as seamless. So is that the only evidence that they were acting as the agents of the lenders? No, there's also evidence that they wanted – there's discussion about it being seamless. So there are concerns, and there's concerns in some of the deposition testimony about people having to go through too many steps or fill out too many forms. I thought, though, that Click Media was basically apportioning the inquiries among differing lenders dependent upon whether they thought they fit the different lenders' – Right. But from the – so from the perspective of the consumer, AC referral wanted them to believe as though this was – they were talking to the lender from the beginning. They did not want it to appear as though they had been talking to some other third party. It was all supposed to be very seamless from the – They didn't mention the lenders by name in any of these, right? Or in text messages that were sent? In the text message, it doesn't mention the lenders by name because it only sent – It doesn't mention Click Media either, does it? Well, the smart credit solution was Click Media's – they were doing business under that name. See, and that's why I asked the question at the beginning. I could see a question of whether or not AC referral was purporting to act as Click Media's agent, but you're not making that argument because you're only – because you're only – you're saying the same arguments apply to everybody. Sure. So they were purporting to act as – But I don't – I can't see any evidence that Click Media – that AC referral was purporting to act as the agent of any of the lenders or the other marketer. So AC referral knew that they were directing people to these lenders, and the ads, the whole system – What's the evidence that they were purporting to act as the agent for the defendants? Put aside what people knew or should have known. What's the evidence that they were – see, the restatement deals with the circumstance where I say, in effect, I'm Judge Acuda's agent, and I'm really not. And I make a deal with you, and then I go back to Judge Acuda, and she says, you weren't my agent, but that's a heck of a deal. I ratify it. And so – but I have to be purporting to act as her agent. So I'm looking for evidence in this record that they purported to act as the agent of the defendants. The evidence is the way that it is set up, as I said, is entirely seamless. So that once you get to that lender's form, so you fill out the form in the smart credit solution website, you move to the lender's website, they – it is set up that way specifically so you thought that you were talking to Judge Acuda the whole time. Is there any evidence that AC referral knew who the lenders were? I'd have to double-check the record on that. But I know that they knew. I couldn't find any. So I know that they knew that they were – that they were with regard to payday lenders. We're all independent of each other, right? The lenders are all, to the best of my knowledge. So, I mean, how could someone be a purported agent for all of them? Because until you get someone to fill out that form, you don't know – they don't know which lender – Is the perspective, the person filling out the form, whether that person believes that they are acting as the agent for the lender? Right. So it's whether – yes, that I think is a serious question as to whether someone purports to be someone's agent, is have they set it up such that the person receiving the communication looks at it and says, oh, yes, I thought that I was talking to this lender the whole time. And that's exactly – that's exactly how this is set up. They want the people filling out these applications – there's talk in the record about trust, right? You want – they want you to think that you've just been filling out forms from this lender the whole time. I think that that's the key point as far as purporting to act as an agent. Help me with – what's the best red flag you have that the lenders – or should have known that there was improper methods used to assemble? Is it just the number? Sure. With regard – so I guess there's a few questions in there. With regard to Leadpile, which is the marketing consultant, the best evidence – We're talking now about the lender. The lender specifically. So with regard to credit payment services, they're effectively the same company as Leadpile. They're owned by the same person, Kerry V. Brown. They were both – Kerry V. Brown and CPS were both convicted of felony usury in the same case. And Kerry V. Brown has admitted that he runs Shell Corporations. That's record 828. So we're – we believe that any knowledge that Leadpile had – that's with regard to the questionnaire – can be imputed as to CPS. With regard to Enova, it's – So I saw with Leadpile you were pointing to certain emails and the like, but they all were aimed at saying click media as a competitor and maybe they're trying to stab us in the back and let's keep a close eye on them. I didn't see anything related to a concern about violations of the TCPA or that improper text messaging might be going forward. So – Anything? Yes. In the questionnaire at page 767, the question asks, what kind of traffic do you have? That is, they're asking, how do you bring in potential customers? Now, there's testimony in the record, 747, that they wouldn't do business with someone who didn't answer that questionnaire. They said they were suspicious of click media. But that doesn't – on its face, doesn't relate to a concern about violations of the TCPA. So respectfully, it can – with drawing the inference in our favor, it can be. Now, you could draw the inference the other way and say, well – How do I draw the inference in your favor for that? What inference would I draw? So the inference is that they're asking about what kind of traffic you have, right? And so why would they ask that question? Well, it doesn't really line up with being concerned about what they say in that email. That question isn't relevant to that – isn't necessarily relevant to that in any way that I can figure out. The reason they're asking that question is, we think, to figure out how they're – They didn't get any response, right? They got no response. Even though they said – You're saying that's enough of a red flag? Considering – Of getting a response? Considering that they testified that if they – that in normal circumstances, their policy is, if they don't receive a response, then they don't do business with the company. So the lead pile says, we're not going to do business with anybody who doesn't fill out this response. And yet, in the case of Click Media, that wasn't true. They kept doing business with them. They kept taking Click Media's money. They kept taking a cut of the – or they kept taking the lender's money, excuse me. They kept taking a cut of the fees they were getting paid. The lenders kept on taking the benefits. There was no – they didn't stop. And so, yes, they – that was enough information that they should have said, well, wait a minute. Why aren't they answering this question? And they didn't do that. You want to save the rest of your time for rebuttal? I would. Thank you, Your Honor. At a time when there are no sirens. May it please the Court. I'm Jim Lord, and I represent the lead pile and CPS in this matter. And I'm going to be sharing the argument in time with Brian O'Meara back here, who represents Inova. So let me ask you at the outset to address something. This looks like the Sergeant Shultz defense. I know nothing. Can the statute be evaded so easily just simply by having layers of consultants and more consultants and saying, don't tell me anything, I don't need to know anything, and there's somebody at the end of it who evades the statute? Is that what the upshot of the district court's decision is? No, Your Honor. In fact, the undisputed evidence here can only establish one conclusion, as the district court found, which is, in fact, the defendants actually did know nothing. And there's no evidence that they took any steps to deliberately avoiding facts so that they could manufacture this giant scheme to avoid knowing whether or not AC referral, who, as the court already pointed out, they didn't even know of, was allegedly violating the TCPA. In terms of authorization, though, somebody would have had to give authorization to contact a cell phone, right? So for your clients to have legitimately contacted these potential plaintiffs, wouldn't those potential plaintiffs have to have given prior approval to have contact? Yes. I guess the question is, how likely is it that you would have gotten that number of referrals? How many people want to give out their cell phone to get a loan? I'm not sure how to answer that, Your Honor, other than what's in the record, and there's nothing in the record to suggest that my clients were involved or any of the lenders were involved at all. I thought the bigger argument had been that the sheer numbers were an alert to you that they must have been using illegal methods to come up with that many names of people that, I mean, was there any indication that AC was doing banner ads or some other way to come up with these names? The issue of consent was not before the court when it came to the summary judgment motion, but we do, in our briefing before the district court, we did argue as well that there was evidence to suggest that consent was obtained, and, in fact, there's deposition testimony to that effect by the principal of AC referral. But the court never got to that issue? Never got to that issue. But Judge Quinn's question is a variant to the one I've been asking. Yes. You get, let's assume, make up a number, I don't know what the record suggests, several hundred thousand leads. It's pretty unlikely, is it pretty unlikely that several hundred thousand people have signed up and consented to get text messages about loans? I wouldn't concede that it's very unlikely. Individuals oftentimes go into other websites that ask for consent, and the consent is broader than simply for the purpose of visiting that specific site. The volume of leads was not, did not give rise to? Exactly. The volume of leads standing alone would not arise to the level of a suspicious fact that's required to put somebody on notice that they have a duty to investigate further. Would you, let's assume in the absence of an agency relationship, the way this thing was set up, would the lenders have had a duty to investigate further had some fact come to their attention that might have led a reasonable person to believe that illegality was going on? I mean, certainly, you know, I can imagine hypothetical situations where a duty to investigate could arise. Let's say among their, you know, thousands of borrowers, you know, a large number of those borrowers had lodged complaints with the lenders that they had not given consent to be contacted with respect to the loans. But there's nothing in the record to suggest that even one borrower lodged that type of complaint. But I understood the legal position in this case to be it really doesn't matter. The bad acts were done by AC referral. They weren't our agent. Well, there's actually not. Even if we became aware of the bad acts, we had no obligation to do anything. Exactly. That's the position I'm questioning. Is that really the law? Exactly. So there's really two alternative arguments here. The first one is that there must be a preexisting agency relationship for liability to be triggered, period. And actually, co-defendant's counsel is going to address that issue in more detail in the time I'm reserving for him. But then the second argument is the one that I've been focused on in addressing the Court's questions, which is, you know, you can't, under the restatement, you do not have responsibility for acts of agents unless there's some suspicious fact or red flag that comes to your attention that triggers a duty for you to investigate. So a threshold there, as I read the restatement in Restatement 406, is that there has to be an agent. And then if the principal ratified the agent's action without knowing material facts and without reason to know them, then the person is not bound by that ratification. And then it has some illustrations about the chandelier in the abandoned building and the like. But it seems like a threshold is that there's an agency relationship. That is our argument, Your Honor, and it's consistent with the Lucia decision and the Taco Bell decision. And co-counsel is going to touch on that further. But because plaintiffs argued that a preexisting agency relationship is not required in their brief, we also addressed their arguments from the standpoint of, even if they're right on that point and we say they're not, we're still not liable because there were no material facts in the record that they can point to that show that we should have been on notice. Other than the sheer volume of the leads developed. Was there any record evidence as to how many phone suppliers Click Media used? I don't know the answer to that, Your Honor. I don't know if there's anything on the record on that point. How much time did you want to reserve for opposing counsel? I was going to reserve three minutes, but if the Court is done with questions for me, I can sit down now. It's your turn. I think I'll defer to co-counsel at this point. Good morning, Your Honors. May it please the Court. My name is Brian O'Mara, and it is my privilege to be here representing ENOVA in this matter. Frankly, I don't have too much more to add. My co-counsel told you that I would be referring to a few issues. I agree with you, Judge, that the inquiry should start and end with the restatement. There was no principal-agent relationship. Taco Bell said that. And while that is an unpublished opinion, it is certainly persuasive. And I understand we're here under a ratification theory. So your argument probably correctly goes to that. But I am concerned about the notion that the Act can be so easily evaded by putting between the lenders and the borrowers so many layers of consultants and contracts that the only people that are reliable in the end is the shady guy who goes out of business. Does the Act really allow that? Is that allowed? No. I mean, I think the way that vicarious liability has been discussed in the case laws, discussed in DISH Network, no, it allows an individual who believes they've been harmed or there's a violation of the TCPA to establish liability through vicarious liability. You don't dispute that to the extent there were violations, your client benefited from them in the sense that they got applications from people. Well, actually, the record is just the opposite. In terms of certainly Enova and Pioneer, the record is clear and undisputed. And the expert, Ms. Snow, reviewed the data and came to the conclusion that Enova and Pioneer received exactly zero leads from the text message campaign. Okay. So take the lender that did. CPS is one lender that Ms. Snow, again, reviewed the data and determined that CPS received four leads. And that's it from the text message campaign. This text message, again, was only a 38-day period. The numbers that the plaintiffs have put forth in their briefing, the thousands of leads and all that is outside the class period. So that's a little bit misleading. But that is uncontested that certainly Pioneer and Enova received zero leads. So I guess your position is given the small number of leads that were illegally obtained, there wasn't any red flag for your clients? There was no spike. There were no leads that we received. And, yes, I would agree with you that there was no red flag on behalf of our clients that would lead us to investigate. Let me ask about Click Media again. I'm more concerned about the procedural posture. And what is your position on whether Christensen can appeal the stipulated grant of summary judgment in favor of Click Media? I was not able to identify any cases that said we would be able to hear that appeal in that context. And Your Honor might be right on that. To be honest, I don't know the answer. It was a stipulation. And I don't recall if a final judgment was that. Wasn't the stipulation that a summary judgment would be entered against Click Media on the same basis that it had been entered? In favor of Click Media, I'm sorry. On the same basis that the other ones were entered into. That is correct. Was that incorporated into the final judgment? Is there a final judgment in favor of Click Media against these plaintiffs? I do not know the answer to that. I think plaintiffs may know better than I. I take it the plaintiffs really don't care since Click Media is bankrupt. We obsess about procedural. That's a fair point, and I certainly appreciate it, Your Honor. Unless the panel has any other questions, I have nothing else. Apparently not.  Thank you very much. And you have some time for rebuttal. I have two brief points on rebuttal, Your Honor. The first is that the expert that Mr. O'Meara referred to, Ms. Snow, actually says in her expert report that there is a dispute as to how many leads each of the lenders bought. She says she disagrees with Mr. Christensen's expert and came to a different conclusion, and she says she doesn't know why. So that's a classic battle of the experts. So for Inova to get up here and say that there's no disputed issue of fact is simply wrong. With regard to the preexisting agency relationship, reading it that way effectively reads out ratification as a possibility. Well, but ratification is a very narrow theory, and that's the problem. I mean, you have many theories below, and ratification is the only one you're pursuing now. So I'm not sure why it reads out ratification as a theory. You know somebody has done something purporting to be your agent or as your agent, perhaps outside the scope of their authority. And then you say, that's okay. That's ratification. But why does the theory need to be broader than that? I see the amount of time. Can I answer the question? Yeah. So it doesn't have to be broader than that, but it's the purporting to act as an agent that gets you there. So the preexisting agency relationship seems to imply that there requires agency outside the ratification context just means authority, actual authority or apparent authority. What ratification says is, well, no, no, no. You don't necessarily need those things at the time of the act if it is later ratified. That gives you the authority. So to say a preexisting relationship is required in the restatement. You read out that requirement of preexisting relationship, then. What you're really saying is whenever one accepts, whenever one ratifies an act, that creates the agency relationship? Yes. And the restatement says the same thing. No, it says that the person has to purport to be an agent. So you're just defining purporting to be an agent very broadly, that if the principal gets any benefit, then the person who caused that benefit purports to be an agent. Is that your? It is if their conduct demonstrates that they purport to act as an agent, even with no authority, even if the principal has never heard of them. Okay. I think we have your argument. Thank you. The case of Christensen v. Credit Payment Services is submitted. And the next case of Suenos v. Diane Goldman is submitted on the briefs. And with that, we are adjourned for this session and for the week.
judges: Ikuta, Hurwitz, Gwin